**Azuzallah SHAHEED–MUHAMMAD Plaintiff,**

v.

**Paul DIPAOLO, et al., Defendants**

**No. CIV.A. 99–11842NG.**

United States District Court, D. Massachusetts.

March 19, 2001.

Azuzallah Shaheed–Muhammad, Florence, AZ, Pro se.

Richard C. McFarland, Elizabeth K. Hayes, Boston, MA, for Defendants.

## *MEMORANDUM AND ORDER*

GERTNER, District Judge.

Azuzallah Shaheed–Muhammad ("Muhammad") brings this action pro se against the defendants, employees of the Massachusetts Department of Corrections ("DOC"). Muhammad alleges a deprivation of his civil rights under 42 U.S.C. § 1983 and under related Massachusetts constitutional and statutory provisions in connection with his incarceration at the Souza–Baranowski Correctional Center ("SBCC") maximum security prison in Shirley, Massachusetts.

Muhammad's claims center around what he describes as a violation of his right to

practice his Muslim religion. He states that between April 29, 1999, and June 23, 1999, the defendants[1] failed to provide him with vegetarian meals in accordance with his religious practices, denied him access to a newspaper published by followers of the Nation of Islam, confiscated a medallion of religious significance, and transferred him to the Southeastern Correctional Center ("SECC") in Bridgewater, Massachusetts, in retaliation for his assertion of constitutionally protected religious freedoms. Muhammad seeks injunctive relief as well as compensatory and punitive damages.

The core of the dispute concerns the scope of the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C.1997 § e(e), an act intended to limit access to the federal courts for certain prisoner claims, namely those for emotional distress unaccompanied by physical harm. I conclude that the provision does not cover the claims alleged by Muhammad because the harms proscribed by the First Amendment, Due Process, or Equal Protection are assaults on individual freedom and personal liberty, even on spiritual autonomy, and not on physical well-being. Intangible rights like these are abridged the moment a state silences free speech or prevents a citizen from following the precepts of his religion. While the violation may be accompanied by psychological or even physical injury, the severity of incursion is not necessarily measured in those terms.

The defendants move for Judgment on the Pleadings under Fed.R.Civ.P. 12(c) alleging that, (1) the plaintiff's claim for injunctive relief is moot because he is no longer in the custody of the Massachusetts DOC; (2) the plaintiff's claim for damages under 42 U.S.C. § 1983 is barred by PLRA, 42 U.S.C.1997 § e(e), because the defendant fails to allege physical injuries as a direct result of the alleged violations; and, (3) this Court should exercise its discretion and dismiss the plaintiff's pendent state law claims.

Muhammad has filed an Opposition to the Defendants' Motion on the grounds that, (1) his claim for injunctive relief is not moot because, as a felon serving a life sentence, he is likely to be transferred back to the maximum security institutions in Massachusetts where the alleged violations originally occurred; (2) he did suffer physical injuries as a direct result of the defendants' actions; and, (3) because his federal claims are properly before this Court, his pendent state law claims should be considered in tandem.

I agree with the defendants that Muhammad's transfer to a correctional facility outside the jurisdiction of Massachusetts renders his claims for injunctive relief against the Massachusetts DOC moot. However, the plaintiff's claims under 42 U.S.C. § 1983 to vindicate violations of the First Amendment, Equal Protection, or Due Process under the Prisoner Litigation Reform Act are not barred. The defendants' Motion For Judgment on The Pleadings [docket entry # 18] is therefore GRANTED as to the plaintiff's claim for injunctive relief under 42 U.S.C. § 1983 and **DENIED** as to the plaintiff's claims for damages under 42 U.S.C. § 1983 and under Massachusetts law.

---

1. Named as defendants are: Paul Dipaolo ("Dipaolo"), former superintendent of SBCC; John Marshall ("Marshall"), former superintendent of the Massachusetts Correctional Institution, Cedar Junction ("MCI–Cedar Junction"); Anthony Mendonsa ("Mendonsa"), SBCC Director of Treatment; David Hughes ("Hughes"), SBCC Director of Food Services; Omar Bassma ("Bassma"), SBCC Muslim Chaplin; Deborah Leabman ("Leabman"), SBCC mail officer; and William Cabino ("Cabino"), correctional officer at MCI–Cedar Junction.

## I. FACTS

Fed.R.Civ.P. 12(c) allows a party, "[a]fter the pleadings are closed but within such time as not to delay the trial, [to] move for judgment on the pleadings." Because the purpose of a motion for judgment on the pleadings is to dispose only of patently meritless cases, a court accepts the factual averments of the non-moving party as true and draws all reasonable inferences in that party's favor. *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988).

Furthermore, I construe a handwritten pro se complaint liberally. As the Supreme Court unanimously held in *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652, (1972), a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 520–521, 92 S.Ct. 594, quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80, (1957). Against this backdrop, I recite the averments of the complaint.

Plaintiff describes himself as a devout Muslim who adheres to the beliefs and teachings of Elijah Muhammad and the Nation of Islam.[2] In accordance with his religious beliefs, plaintiff adheres to a strictly vegetarian diet, which he qualifies as comestibles that do not contain "cattle, hog, bird, fish, and any other living organism that has the ability to flee man if he pursues it."[3]

In a letter dated April 29, 1999, Muhammad, while confined at SBCC, initiated his request to defendant Bassma for access to

---

**2.** Founded in 1930, the Nation of Islam is a Muslim sub-sect that shares many beliefs and practices of traditional Islam (including Sunni Muslims, Shiites, Ah–Mahidiyas, Sufi and Alislam), such as the acceptance of the Quran, the acceptance of Allah as the only God, the acceptance of Muhammad as Allah's supreme prophet, and the acceptance of the Five Pillars of Islam: Declaration of faith (*shahada*), prayer (*salat*), charity (*zakat*), fasting (*sawm*), and pilgrimage to Mecca (*hajj*). Consistent with traditional Islam, Nation of Islam adherents pray five times daily and forswear gambling, drinking alcohol, and usury.

However, unlike traditional Muslims, members of the Nation of Islam believe that Allah came to the United States in 1930 in the person of Fard Muhammad (born Wallace D. Fard) to delegate Elijah Muhammad as his messenger. Furthermore, members advocate a distinctive story of creation that emphasizes the inherently divine qualities of black people and their unique relationship with God. Members do not believe in an afterlife. They generally hold primary religious services on Sundays (as opposed to the conventional Islamic holy day, Friday) in which a minister, rather than an *imam*, delivers a lecture with a theme pertinent to the African–American community. They celebrate several holidays unique to their sect, such as Savior's Day on February 26 (to honor Fard), Founder's Day on October 7 (to honor Elijah Muhammad) and a daylight fast similar to Ramadan during the month of December. For good overviews of the founding and development of the Nation of Islam, *see History of the Nation of Islam* by Elijah Muhammad (Secretarius Publishers, 1996); *Lost–Found Nation of Islam in America* by Clifton Marsh (Scarecrow Press, reprint ed.2000).

**3.** October 23, 2000 Affidavit of Muhammad, ¶ 2 (hereinafter "Muhammad Aff."). While all Muslims eschew consuming pork, some sub-sects impose further dietary restrictions, such as a *halal* diet, which, akin to a kosher diet, requires that land animals be slaughtered in a certain fashion before they may properly be consumed. The plaintiff derives his religious conviction as to diet from *How to Eat to Live*, Elijah Muhammad's compilation of dietary guidelines for his followers (which includes exhortations to eat one meal a day and forego eating corn bread, nuts, halibut, catfish, carp, eel, oyster, lobster, crab, clam, shrimp and snail). Complaint ¶ 17.

a special diet in accordance with the plaintiff's religious needs. On May 6, 1999, Bassma acknowledged his receipt of Muhammad's letter, but informed the plaintiff that he was unable to gratify the request for a special diet. Instead, Bassma informed Muhammad of his intention to refer the issue to Anthony Mendonsa, the Director of Treatment at SBCC.

Muhammad followed up this conversation with a letter dated May 6, 1999, to defendant Mendonsa, a letter dated May 24, 1999, to defendant Dipaolo, and a letter dated June 17, 1999, to defendant Hughes renewing in each his request for a special diet consistent with his religious beliefs. Yet, despite Muhammad's repeated efforts, officials at SBCC never granted his request for special diet by the time of his transfer to SECC on June 24, 1999.

Muhammad asserts a second, related pattern of constitutional infraction in which the defendants are alleged to have denied the plaintiff access to certain religious publications. On May 4, 1999, Muhammad placed an order for two newspaper issues published by the Allah Youth Center In Mecca ("AYCIM") in New York City, an organization founded and run by members of the Nation of Islam.[4] The order was approved by Unit Manager Eilene Simas on May 5, 1999, and executed after appropriate costs were withdrawn from Muhammad's prison account.

On May 25, 1999, Muhammad received a "Notice of Non-delivery of Mail" form signed by SBCC Mailroom Officer Leabman. The notice stated that the newspaper sought from the AYCIM, *The Five–Fercenter* newspaper, was deemed contraband by Inner Perimeter Security ("IPS") and designated for return to the AYCIM on May 26, 1999.

Muhammad immediately appealed Leabman's decision to Superintendent Dipaolo.[5] In addition, by letter dated June 19, 1999, Muhammad requested that the AYCIM file an appeal on Muhammad's behalf to Leabman. However, there is no indication in the complaint or in any of the pleadings that Dipaolo or other officials in the Massachusetts DOC responded to Muhammad's appeal.

Muhammad contends that these actions by the DOC violated his constitutional rights under the free exercise provision of the First Amendment. He believes the leaders of the AYCIM to be the "Poor Righteous Teachers of the Nation of Islam," entrusted by God with the task of civilizing and incorporating Black youth into the "reality and oneness of Allah."[6] As Muhammad considers the guidance and teaching provided by these "Righteous Teachers" in their newspaper publications a "significant aspect of [his] religion,"[7] he claims that the DOC's interception of the publications interfered with his ability to practice his faith meaningfully.

Finally, Muhammad alleges that his rights were violated when defendant Cabino confiscated the plaintiff's plastic crescent-moon medallion on April 19, 1999.[8]

---

4. Complaint ¶ 24.

5. In his appeal, Muhammad asserted four grounds under the Code of Massachusetts Regulations ("CMR"), including failure to state a reason for denying delivery in violation of 103 CMR 481.16(2)(a), failure to make reference to the specific articles deemed objectionable in violation of 103 CMR 481.15(2)(i), improper exercise of authority by a deputy superintendent in violation of 103 CMR 481.15(2)(a), and improper exercise of authority by a mailroom or IPS officer in violation of 103 CMR 481.15(2)(c).

6. Complaint ¶ 24.

7. Complaint ¶ 26.

8. There is some inconsistency as to chronology in Muhammad's complaint. He alleges in Paragraph 29 that the medallion was confis-

While incarcerated at MCI–Cedar Junction in Walpole, Massachusetts, Muhammad wore a medallion consisting of the Sun, Moon, and Star of Islam, which, according to Muhammad, represents *dhikr*, or "remembrance," *taqwa*, or "God-consciousness," and protection against *shaitanir rajim*, or an "outcasted devil." [9]

On April 18 of either 1998 or 1999, defendant Cabino allegedly approached Muhammad while exiting the dining hall and inquired about the medallion adorning Muhammad's neck. Muhammad claims that despite explaining to Cabino the religious significance of the talisman, Cabino ordered Muhammad to yield the medallion or "cuff up and go to the hole." [10] Muhammad then turned over the medallion, and Cabino, designating it contraband, sent it to the property department.

On August 24, 1999, Muhammad brought this action against the defendants, asserting four claims for relief under Massachusetts law and four claims for relief under Federal law. Sometime after filing the complaint, Muhammad was transferred to the Arizona Prison Complex in Florence, Arizona. [11]

Specifically, Muhammad asserts the following claims under Massachusetts law: (1) Violations of the Code of Massachusetts Regulations (Count I); [12] (2) violations of Mass. Gen. L. c. 127 §§ 87 and 88 and Mass. Gen. L. c. 12 §§ 11H and 11I (Count II); [13] violation of the plaintiff's religious freedoms under the Massachusetts Declaration of Rights of the Massachusetts Constitution, Articles 1, 2, 18, and 46 (Count III); and malicious abuse of process/misuse of power (Count VII). [14]

■ Muhammad brings the following causes of action under 42 U.S.C. § 1983:(1) Violation of the Free Exercise Clause of the First Amendment of the United States Constitution (Count IV); [15] violation of the

---

cated on April 18, 1999, while in Paragraph 38, he designates April 19, 1998 as the date of confiscation.

9. Complaint ¶¶ 29, 43.

10. Complaint ¶ 33.

11. It is unclear when Muhammad was transferred out of the custody of the Massachusetts DOC. In Paragraph 2 of their Motion to Set Aside Entry of Default, the defendants claim that Muhammad was transferred to the Arizona State Prison on January 25, 2000. However, on page 2 of their Memorandum of Law in Support of their Motion for Judgment on the Pleadings, [hereinafter "Defendants' Memorandum"] the defendants claim that Muhammad was transferred to the Arizona Prison Complex on December 28, 1990. However, I credit the former date as being accurate because, in his Opposition to Defendants' Motion to Set Aside Entry of Default, plaintiff likewise designates January 25, 2000, as the date of his transfer to Arizona. Opposition to Defendants' Motion to Set Aside Entry of Default, ¶ 4. Moreover, this date makes more sense considering the time frame of the plaintiff's allegations (late 1998–1999).

12. 103 CMR 403.10(4), (6)(c), and (7)(d); 103 CMR 403.11; 103 CMR 471.09(5)(a) and .09(9); and 103 CMR 481.01 et seq.

13. These provisions discuss the privileges afforded by law to inmates incarcerated in Massachusetts prisons, including rights of correspondence, access to religious services and practices, and recovery for civil rights violations.

14. Malicious abuse of process is a tort claim under Massachusetts law where a legal process is used to further an illegitimate purpose for which it was not designed. *Jones v. Brockton Pub. Mkts.*, 369 Mass. 387, 389, 340 N.E.2d 484 (1975).

15. Where an inmate shows that prison officials, without any justification reasonably related to legitimate penological interests, prevented him from engaging in conduct mandated by his faith, he or she establishes a free exercise violation. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Equal Protection Clause of the Fourteenth Amendment of the United States Constitution (Count V); [16] violation of the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution (Count VI); [17] and retaliation against the plaintiff for having exercised his rights under the First Amendment (Count VIII). [18]

On May 9, 2000, this Court entered a Notice of Default against the defendants for failing to answer the complaint within the appropriate time. On August 30, 2000, this Court notified the defendants that default judgment would enter unless a notice of appearance was entered on behalf of the defendants by September 20, 2000. Defendants' Motion for Enlargement of Time was granted on September 7, 2000, and, on October 19, 2000, this Court granted the defendants' Motion to Set Aside the Entry of Default and accepted their pleadings.

Their answer to the complaint now properly before this Court, the defendants filed their Motion for Judgment on the Pleadings on October 19, 2000. Muhammad has filed an Opposition to the Motion.

## II. *LEGAL DISCUSSION*

### A. *Injunctive Relief Under 42 U.S.C. § 1983*

■ The exercise of judicial power under Article III of the Constitution depends on the existence of a case or controversy.

Judgments must resolve "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Therefore, where intervening events resolve a potential controversy with "no reasonable expectation that the wrong will be repeated," a case becomes moot and a federal court is stripped of its authority to exert jurisdiction over the matter. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–4, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

■ For this reason, Muhammad's transfer from an institution under the aegis of the Massachusetts DOC to an Arizona prison renders his request for injunctive relief as against the Massachusetts DOC moot. He currently suffers no continuing or immediate threat of repeated injury at the hands of the Massachusetts DOC, its officials, or its institutions. *See e.g. Fournier v. Ruane, et al,* No. 00CV–12104–NG (December 19, 2000)(challenge to defendants' participation in an event intended to educate students about gay and lesbian families moot where the event was already held, with no plans for its repetition).

Muhammad contends that there is a substantial likelihood that he will be returned to SBCC or MCI–Cedar Junction

16. Plaintiff alleges that the defendants, in denying him access to vegetarian meals, denying him access to *The Five–Percenter* newspaper, and confiscating his religious medallion, violated the Equal Protection Clause by treating him differently than similarly situated prisoners asserting their religious freedoms.

17. Plaintiff alleges that the defendants denied him due process of law when, in contravention of clearly established prison procedures, they ignored his requests for a special diet, denied him access to periodicals without providing justification or opportunity to appeal, and confiscated his medallion.

18. Otherwise constitutional conduct may be actionable if taken to discipline someone for exercising their constitutionally protected rights. *Ferranti v. Moran,* 618 F.2d 888, 892 n. 4 (1st Cir.1980). This includes transferring a prisoner from one institution to another for engaging in constitutionally protected activity. *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir. 1979).

and suffer the identical harm at the hands of the defendants still working at these institutions. His argument springs from the following facts: Muhammad is serving a life sentence. The DOC assigns inmates serving life sentences a higher security status and confines them at appropriately higher security prisons. Muhammad alleges that because SBCC and MCI–Cedar Junction are the two maximum security prisons in Massachusetts, he is likely to return to those prisons *if* returned to the jurisdiction of the Massachusetts penal system.

■ Construing his pro se pleadings liberally, it appears that Muhammad seeks to qualify under the "capable of repetition, yet evading review" exception to the mootness doctrine. To prevail under this limited exception, Muhammad must show: (1) The challenged action was of too short a duration to be fully litigated; and, (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975).

Muhammad, however, has not introduced any evidence that suggests a likely return to Massachusetts or a likely recurrence of infraction thereafter. The possibility of future harm based only on prior injury and the organization of the Massachusetts prison system is too remote to overcome the mootness doctrine.[19] *E.g. Wiggins v. Rushen*, 760 F.2d 1009, 1013 (9th Cir.1985) (A prisoner's claim for injunctive relief against limitations on access to a prison library was mooted by his transfer, and the possibility that he might return was "too speculative" to rise to the level of reasonable expectation or demonstrated probability).

Accordingly, because Muhammad has been transferred out of the jurisdiction of the Massachusetts DOC, this Court finds his claim for injunctive relief under 42 U.S.C. § 1983 moot. *E.g. Preiser v. Newkirk*, 422 U.S. 395, 402–03, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (action brought by a state prisoner for injunctive relief/declaratory judgment rendered moot because the challenged actions were no longer in effect when the case reached the district court); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir.1996) (transfer to another prison moots a prisoner's request for injunctive relief); *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir.1986) (same). To the extent that Muhammad has expressed viable claims for equitable relief, they relate to the conditions of his confinement at Massachusetts DOC institutions and may be asserted legitimately before this Court only after he is returned to those institutions.

### B.  *Damages Under 42 U.S.C. § 1983*

Defendants argue that Muhammad's claims for damages under 42 U.S.C. § 1983 must fail because, under the PLRA, a prisoner is prohibited from recovering in a civil action for emotional or psychological harm when that harm is not accompanied by physical injury. Noting that Muhammad failed to allege any physical injury in his complaint, the defendants characterize the alleged harm suffered by Muhammad as being purely "emotional distress," and hence foreclosed under the PLRA.[20]

The relevant provision of the PLRA, Section 803(d), as codified at 42 U.S.C. § 1997e(e), states:

---

**19.** "[P]ast exposure to illegal conduct does not establish a live claim if there is no continuing present adverse effect." 13A Charles Alan Wright, Arthur R. Miller & Edward H.

Cooper, *Federal Practice and Procedure* § 3533.8 at 374 (Supp.1999).

**20.** Defendants' Memorandum at 4.

No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

There is no dispute that Muhammad is subject to the provisions of the PLRA. His complaint was filed after the adoption of the Act, and he has been a prisoner in the custody of the Massachusetts DOC throughout the period of the alleged constitutional infractions.

■ However, there is dispute concerning the precise reach of § 1997e(e). I reject the defendants' interpretation and conclude as follows: Where the harm that is constitutionally actionable *is* physical or emotional injury occasioned by a violation of rights, § 1997e(e) applies. In contrast, where the harm that is constitutionally actionable is the violation of intangible rights—regardless of actual physical or emotional injury—section 1997e(e) does not govern.

The latter construction makes sense for a number of reasons. First, the language of the rider: A prisoner is barred from bringing into federal court an action "for" emotional damages suffered while in custody, unaccompanied by physical injury. However, the constitutional violations of the type at issue here are not actions "for"

emotional distress. *See Memphis Community School District v. Stachura*, 477 U.S. 299, 308 n. 11, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (courts should vindicate deprivations of certain "absolute" rights that are not shown to have caused actual injury because of their fundamental importance in organized society). The severity of the violation is not measured by the independent physical harm they produce.

As one commentator noted:

This recognition that significant mental and emotional injuries can exist irrespective of physical impact is particularly important where constitutional rights are concerned. Within the area of constitutional rights, recovery for mental and emotional harms has never been predicated on the finding of physical injury—nor could it have been. While there are some constitutional provisions, such as the Fourth and Eighth Amendments, that find ready analogies in common law torts, the Constitution also protects a host of intangible rights that can be violated without concurrent physical injuries.

Stacey Heather O'Bryan, "Closing the Courthouse Door: The Impact of the Prison Litigation Reform Act's Physical Injury Requirement on the Constitutional Rights of Prisoners," 83 Va. L.Rev. 1189, 1199 (September 1997).[21]

---

21. *Cf. Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (to state a cognizable Eighth Amendment claim based on medical mistreatment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs"); *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (in evaluating an Eighth Amendment claim for excessive use of force courts should consider the extent of injury inflicted). Because Eighth Amendment claims are akin to conventional actions for tort damages (though the duty is imposed by the Constitution and federal statute rather than the common law),

it is more appropriate to require a causal connection between the state's breach and the plaintiff's demonstrable injury. Therefore, courts have consistently applied section 1997e(e) to prisoners' Eighth Amendment claims. *E.g. Hill v. Plummer*, 1998 WL 305517 (N.D.Cal.1998) (relief barred for Eight Amendment claim where only alleged harm is fear of shock from electronic restraining device); *Zehner v. Trigg*, 952 F.Supp. 1318 (S.D.Ind.), *aff'd* 133 F.3d 459, 461 (7th Cir. 1997) (forced exposure to asbestos without a showing of physical harm barred under § 1997e(e)).

Muhammad's First Amendment,[22] Equal Protection, and Due Process claims, in short, are claims for violations of abstract rights. While their violation may be accompanied by emotional or even physical injury, an action under § 1983 is not brought to redress such harms.

The First Amendment, for example, is not concerned with preventing physical abuse by government agents, but rather with the invasion of the "sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).[23] When government proscribes free inquiry, thought, or discourse, when it forecloses or impedes the right to publish, distribute, or read, or when it intentionally favors one religion over another, it violates the amorphous rights secured under the First Amendment irrespective of resulting physical injury. *E.g. City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (ordinance banning all residential signs violates the First Amendment); *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (First Amendment rights of applicants for public employment are breached when they are rejected on the basis of political affiliation).

Likewise, Equal Protection proscribes the differential treatment of similarly situated individuals or groups without valid justification regardless of accompanying physical harm. *E.g. Brown v. Board of Education,* 347 U.S. 483, 494, 74 S.Ct. 686 (1954) (emphasizing the stigmatic rather than physical harm of state sponsored racial segregation); *Nixon v. Herndon,* 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927) (wrongful deprivation of voting rights alone engenders a colorable claim for damages under the Fourteenth Amendment).

Similarly, Due Process is offended when state actors deprive someone of constitutionally protected liberty or property interests without adequate procedural safeguards, irrespective of attendant physical harm. *E.g. Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (the denial of procedural Due Process may be actionable for nominal damages without proof of actual injury).

Second, the interpretation I advance is consistent with the legislative history and purposes of the PLRA.[24] The Prison Litigation Reform Act was passed by Congress as a rider to the Omnibus Consolidated Rescission and Appropriations Act of 1996 and signed into law by President

---

22. For the sake of simplicity, I consider the plaintiff's distinct free exercise and retaliation claims together in my First Amendment analysis.

23. As the Supreme Court declared memorable in *Barnette,* "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. at 642, 63 S.Ct. 1178.

24. In my judgment, the language of section 1997e(e) is clear—actions of the type alleged here are not included. However, at the very least, one could argue that the statute is ambiguous. Where the meaning of statutory language is equivocal, courts should interpret the language with reference to the statutory purpose, as I have done above. *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (" 'Our task [in interpreting statutes] is to give effect to the will of Congress' ") (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *Passamaquoddy Tribe v. Maine,* 75 F.3d 784, 788 (1st Cir. 1996).

Clinton on April 26, 1996.[25] It was intended to reduce frivolous prisoner litigation about conditions of confinement and conserve scarce judicial resources. In testifying in support of the litigation, Senator Orrin Hatch claimed that the PLRA would "help bring relief to a civil justice system overburdened by frivolous prisoner lawsuits."[26] Senator Bob Dole argued that Congress needed to curtail "[f]rivolous lawsuits filed by prisoners [that] tie up the courts, waste valuable judicial and legal resources, and affect the quality of justice enjoyed by the law-abiding population,"[27] considering that the number of lawsuits filed by prisoners concerning prison conditions had risen from 6,000 in 1975 to 39,000 in 1994.[28]

But while the PLRA dramatically curtailed the litigation options available to prisoners,[29] it was not its purpose to insulate from review all claims in which legitimate constitutional issues predominate without accompanying physical harm. 28 U.S.C.A. § 1915(g). Plainly, claims of racial discrimination or the infringement of religious freedoms in the prison setting are qualitatively different from lawsuits seeking damages for "insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and yes, being served chunky peanut butter instead of the creamy variety."[30]

A number of federal courts have drawn similar distinctions, applying the physical injury requirement of § 1997e(e) when the underlying claim is "for" physical injuries. *See Siglar v. Hightower*, 112 F.3d 191, 193–4 (5th Cir.1997); *Zehner*, 952 F.Supp. at 1322–23; *Brazeau v. Travis*, 1996 WL 391701, *1 (N.D.N.Y.). But, courts have likewise rejected its application when, for example, the underlying claim is "for" a violation of the First Amendment. As the Ninth Circuit held in *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir.1998), "[t]he deprivation of First Amendment rights entitles a plaintiff judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred." 143 F.3d at 1213. *See also Williams v. Ollis*, 230 F.3d 1361 (6th Cir. 2000) (PLRA does not cover First Amendment retaliation claim); *Rowe v. Shake*, 196 F.3d 778, 781 (7th Cir.1999) (No requirement of physical, mental or emotional injury for First Amendment claim because deprivation of First Amendment rights standing alone is a cognizable injury); *Amaker v. Haponik*, 1999 WL 76798, at *7 (S.D.N.Y.) (§ 1997e(e) did not bar plaintiff's First Amendment claims); *Mason v. Schriro*, 45 F.Supp.2d 709, 720 (W.D.Mo. 1999) (§ 1997e(e) does not apply to Equal Protection claims under the Fourteenth Amendment); *Lewis v. Sheahan*, 35 F.Supp.2d 633, 637 n. 3 (N.D.Ill.1999) (§ 1997e(e) does not bar a right of access claim); *Friedland v. Fauver*, 6 F.Supp.2d

---

**25.** 1995, Pub.L. 104–134, 110 Stat. §§ 1321–66 to 1321–77 (1996), codified at 18 U.S.C. § 3626.

**26.** 141 CONG. REC. S14408–01, *S14418 (Sept. 27, 1995) (statement of Sen. Hatch).

**27.** 141 CONG. REC. S7498–01, *S7524 (May 25, 1995) (statement of Sen. Dole).

**28.** 141 CONG. REC. S14408–01, *S14413 (Sept. 27, 1995) (statement of Sen. Dole).

**29.** In addition to incorporating section 1997e(e), the PLRA imposed a $150 civil filing fee on all inmates (indigent or otherwise), imposed limitations on the award of attorney's fees, and incorporated a "three strikes" provision, which bars prisoners with three prior suits dismissed as frivolous from proceeding in forma pauperis.

**30.** 141 CONG. REC. S14408–01, *S14413 (Sept. 27, 1995) (statement of Sen. Dole).

292 (D.N.J.1998) (§ 1997e(e) did not bar claim for unconstitutional incarceration following arrest without probable cause); *Warburton v. Underwood,* 2 F.Supp.2d 306, 315 (W.D.N.Y.1998) (declining to dismiss Establishment Clause claim under § 1997e(e) for want of plaintiff's showing of physical injury because "such claims nevertheless deserve to be heard").[31]

Muhammad's rights were violated at the precise moment when Massachusetts DOC officials allegedly denied him access to his dietary needs and religious articles, rather than when these deprivations later resulted in emotional, psychological, or physical harm. For these reasons, the § 1997e(e) limitation on recovery is simply not applicable to Muhammad's allegations.

### C. *Pendent State Law Claims*

Since there is an actionable basis for plaintiff's federal causes of action, this Court will continue to exert pendent jurisdiction over the state law claims alleged to arise from a common nucleus of operative fact. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### III. *CONCLUSION*

Because Muhammad's claim for injunctive relief is moot, the defendants' Motion For Judgment on The Pleadings [docket entry #18] is **GRANTED** insofar as it relates to equitable remedies. However, because Muhammad's claims under 42 U.S.C. § 1983 are not barred by section 1997e(e) of the PLRA, the defendants' Motion is **DENIED** insofar as it relates to claims for damages. Furthermore, the defendants' Motion is **DENIED** insofar as it relates to Muhammad's state law claims, properly within this Court's pendent jurisdiction.

**SO ORDERED.**

---

**31.** To be sure, Muhammad does proffer specific examples of physical harm suffered as a result of actions taken by the defendants, including fatigue, weight loss, and one episode of fainting that resulted in a minor head injury. *See* Muhammad Aff. ¶¶ 1,2. However, courts have largely found these types of injuries insufficient to satisfy the physical injury component of section 1997e(e). *E.g. Siglar,* 112 F.3d at 193 (bruised ear lasting for three days did not constitute physical injury); *Santiago v. C.O. Campisi Shield,* 91 F.Supp.2d 665, 676 (S.D.N.Y.2000) (stress and difficulty sleeping do not constitute physical injury); *Cannon v. Burkybile,* 2000 WL 1409852, *6 (N.D.Ill.) (headaches, insomnia, stress, and stomach anxiety do not meet the physical injury requirement); *Porter v. Coombe,* 1999 WL 587896, *3 (S.D.N.Y.1999) (prisoner's § 1983 claim for lost weight due to restricted diet did not allege a sufficient physical injury); *Plasencia v. California,* 29 F.Supp.2d 1145, 1152 (C.D.Cal.1998) (weight loss insufficient to constitute physical injury).