**UNITED STATES of America Plaintiff**

v.

**[1] Carlos Ayala LOPEZ Defendant**

**No. CRIM. 03–55(SEC).**

United States District Court,
D. Puerto Rico.

July 15, 2004.

Daniel J. Vaccaro, AUSA, U.S. Attorney's Office, San Juan, for Plaintiffs.

Juan A. Pedrosa–Trapaga, Esq., San Juan, William D. Matthewman, Esq., Seiden, Alder & Matthewman, Boca Raton, FL, for Defendants.

## ORDER

CASELLAS, District Judge.

Pending before the Court is Defendant Carlos Ayala López's motion for an evidentiary hearing on the conditions of his pretrial confinement (Docket # 205). The

Government objected to Defendant's request (Docket #226). A reply (Docket #257) and sur-reply (Docket #268) ensued. For the reasons expressed below, we find that Defendant's placement in administrative housing is not tied to any legitimate governmental interest and therefore constitutes unconstitutional punishment. We explain.

## Procedural Background

Defendant Ayala is a pretrial detainee confined in the Special Housing Unit (hereinafter "SHU") at MDC–Guaynabo ("MDC"). He has been incarcerated at MDC since his arrest on February 19, 2003. On December 17, 2003, the Government filed its notice of intent to seek the death penalty against Defendant (Docket #195). Shortly thereafter, Defendant received an Administrative Detention Order dated December 20,2003 stating that he had been placed in MDC's SHU. The stated reason was: "You were placed in Administrative Detention for Pending Captain's Review (Death Penalty Sentencing)."(Docket #257, Exh. A). Prior to December 20, 2003, Defendant had resided in the general population for ten (10) months without any significant incident.

This matter was submitted to the Court on March 25, 2004—the date the sur-reply was filed. At several status conferences in this case, the Court expressed that it was awaiting Magistrate Judge Aida Delgado's report and recommendation in Criminal Case No. 02–117(PG). Said case concerned two death eligible pretrial detainees that had also been placed in SHU. The defendants challenged the conditions of their confinements. The matter was referred by U.S. District Judge Juan Pérez Giménez to Magistrate Judge Delgado for an evidentiary hearing. Magistrate Judge Delgado held a hearing on March 10, 2004 and issued her report and recommendation on June 30, 2004 (Docket #329, Exh. A). Because of the duplicity that holding a second hearing on the matter would present, we take judicial notice of the testimony presented at said hearing as reported by the Magistrate, bypass holding a second hearing on the same matter, and proceed to consider the arguments extensively presented by the parties' in the filings before us.

## Proceedings before Magistrate Judge Delgado

At the hearing, the Government presented the testimony of Michael Smith, Chief Segregation Review Officer at MDC. He was the only witness at the hearing. The Court did, however, direct inquiries at Ricardo E. Chávez, Warden at MDC, who was also present at the hearing. Officer Smith testified that it is his job to ensure the safety and security of the institution and the orderly running and operation of the same. Placement on SHU depends on his determination. Among his duties is the supervision of SHU, which he described as a unit meant to allow for the segregation of selected inmates from the general population. Officer Smith explained that inmates are placed in the segregation unit to secure the orderly operation or running of the institution and also upon an inmate's request to be placed there for security or other concerns. He further testified that an inmate is placed in SHU if there is a breach of an institutional administrative regulation, if the prisoner is involved in a fight, or if the prisoner attempts to escape from the institution. Officer Smith also stated that Defendants that are convicted and sentenced on murder charges are also placed in SHU. He also testified regarding Program Statement 7331.04, issued by the Bureau of Prisons (B.O.P.), which details important criteria for assessing an inmate's security requirements and on which he bases his decisions.

In spite of this testimony, and crucial to the matter at hand, Officer Smith testified

that it is standard operating procedure that once he becomes aware that an inmate is facing the death penalty, he immediately orders that the inmate be placed in SHU. This operating procedure is automatic. The death certification essentially obviates all other criteria as it is determinative. Furthermore, in spite of the several review procedures in place for SHU placements, placement in SHU for inmates facing the death penalty is permanent. Officer Smith testified that "no matter what," a death penalty certified inmate remains in SHU.

## Special Housing Unit (SHU)

In order to understand the issues before us, it is imperative that we describe the confinement conditions at SHU. "Administrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self or with other inmates which serves to remove the inmate from the general population." 28 C.F.R. § 541.22. It is undisputed that SHU is different from the general population, and that the differences result in greater restrictions and far fewer privileges for inmates housed in SHU. For example, work programs and educational classes are not available. However, educational items can be brought to inmates in SHU. Inmates in SHU do not have access to religious services although they do have access to a chaplain. Visits to inmates housed in SHU entail two to four times the wait and require additional security; the inmate remains handcuffed, both hands and legs, throughout the visit. SHU inmates have no access to television while general population inmates have access to television sets, except at night. Most noticeably, inmates housed in SHU are only allowed one hour of recreation every 24 hours in a holding pen. In contrast, inmates in the general population may exercise up to 9:00 P.M., except during head count. The Program Statement specifies that:

Staff shall permit each segregated inmate no less than five hours exercise each week. Exercise should be provided in five one-hour periods, on five different days, but if circumstances require, one-half hour periods are acceptable if the five-hour minimum and different day schedule is maintained.

*Program Statement: Inmate Housing Discipline and Special Housing Units, 5270.07, Chap. 9, p. 9, § 3(d)* (Docket # 226, Exh. C). Moreover, inmates in SHU may use the telephone for fifteen (15) minutes, once a week (with the exception to calls to attorneys), while general population inmates may use the telephone as many times a day as desired and/or possible in fifteen (15) minute increments. Finally, there are several other privileges that are available to general population inmates that are not available to those in SHU, i.e., cigarettes, microwave ovens, thicker mattresses, sodas, ice, privacy while showering, access to the commissary.

## The Prisoners Litigation Reform Act (PLRA)

■ The Government asserts that Defendant is foreclosed from seeking relief by the Prisoners Litigation Reform Act ("PRLA") since he has not exhausted all the administrative remedies available to him as required by the Act. The PRLA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such remedies as are available are exhausted." 42 U.S.C.1997e(a). In his reply, Defendant purports that the PRLA simply does not apply to the pending motion in the criminal case at bar since it is not a civil action or a lawsuit in federal court. The Government has responded to this argument stretching the applicability of the Act to motions, as they would inevi-

tably result in some sort of judgment or decree.[1]

While the Governments approach makes common sense, we decline the invitation to expand the statute to other than its plain meaning.

"Common sense" is a treacherous guide to statutory interpretation. One person's "common sense" is another's bte [sic] noire. Statutes are compromises among legislators who may hold incompatible conceptions of the public weal. Some legislators opposed the [PLRA] outright; others wanted more sweeping restrictions on prisoners' litigation; the actual statute satisfied few completely. Instead of relying on "common sense", which is an invitation to treat the law as if one side or the other had its way, a court should implement the language actually enacted—provided the statute is not internally inconsistent or otherwise absurd.

*Kerr v. Puckett*, 138 F.3d 321 (7th Cir. 1998). *See, e.g., Salinas v. United States,* 522 U.S. 52, 57, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *Felker v. Turpin*, 518 U.S. 651, 653, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996); *In re BankVest Capital Corp.,* 360 F.3d 291, 293 (1st Cir.2004).

In addition, the legislative history, although limited, indicates that Congress' general purpose in passing the Act was to curb frivolous prisoner lawsuits. According to Senator Hatch, the PRLA "will bring relief to a civil justice system over-

burdened by frivolous prisoner lawsuits ... Our legislation will also help restore balance to prison conditions litigation and will ensure that Federal court orders are limited to remedying actual violations of prisoners' rights ..." 141 Cong. Rec. S14408–01, *S14418 (daily ed. Sept. 27, 1995) (statement of Sen. Hatch). In the same vein, Senator Dole expressed his concern with the growing number of frivolous suits concerning "insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and yes, being served chunky peanut butter instead of the creamy variety." 141 Cong. Rec. S14408–01, *S14413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole).

Defendant's motion is not within the purview of the concerns raised by the Senators in enacting the bill. Instead, it is exactly the type of request for which justice should not be delayed by an overcrowded docket. Similar distinctions have been made by our sister district courts when interpreting the "physical harm" requirement. Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). However, despite this language, courts have found that "where the harm that is constitutionally

---

1. The Government supports this argument with the definition of the word "action." According to Black's Law Dictionary, action, in the third and only applicable definition, is defined as: "a civil or criminal judicial proceeding." *Black's Law Dictionary* (7th ed.1999). The definition further provides, as proffered by the Government, that action is a "judicial proceeding, in which if conducted to a determination, will result in a judgment or decree." *Id. (quoting* 1 Morris M. Estee, *Estee's Pleadings, Practice, and Forms* § 3, at 1

(Carter P. Pomeroy ed., 3d ed. 1885)). In contrast, motion is defined as "[a] written or oral application requesting a court to make a specified ruling or order." *Black's Law Dictionary* (7th ed.1999). The distinction is clearly beyond semantics. Defendant's request does not beget the institution of a proceeding which will terminate at judgment. Instead, it is circumscribed to a particular ruling, which is qualitatively different. We stop this argument here, where it becomes unavoidably circular.

actionable is the violation of intangible rights—regardless of actual physical or emotional injury—section 1997e(e) does not govern." *Shaheed–Muhammad v. Dipaolo,* 138 F.Supp.2d 99, 107 (D.Mass. 2001).[2] In making this distinction, courts have expressed that "[t]here is a point beyond which Congress may not restrict the availability of judicial remedies for the violations of constitutional rights without in essence taking away the rights themselves by rending them utterly hollow promises." *Zehner v. Trigg,* 952 F.Supp. 1318, 1331 (S.D.Ind.1997). We could not agree more.

Thus, we find that Defendant's motion falls outside of the intended coverage of the PRLA as well as its plain language.[3] The Government argues that because Defendant's motion would inevitably result in some type of judgment or decree, it is an action, and therefore, Defendant is foreclosed from seeking relief. We will not ratchet out the PRLA and read the word motion into the Act in order for it to be applicable to Defendant's motion. We similarly refuse to make the syllogistic jump suggested by the Government. Con-sequently, we find that the exhaustion requirements do not apply in the instant case. Furthermore, we do not require exhaustion of administrative remedies as they would be futile in Defendant's case given Officer Smith's and Warden Chávez's beliefs regarding death eligible inmates.[4]

### The Warden's Discretion to Operate MDC–Guaynabo

The Government supports the decision to place Defendant in SHU by arguing that the warden has broad discretionary authority in administering the prison. The Court is fully aware of the warden's discretion in operating MDC. However, the warden may not exercise unfettered discretion.

■■■ It is well settled that the government may lawfully incarcerate persons awaiting trial on criminal charges; however-er, the government may not punish them. *Bell v. Wolfish,* 441 U.S. 520, 534–35, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). As explained by the Supreme Court, "a particular condition or restriction of pretrial detention [should be] reasonably related to a

---

**2.** *See also Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir.1998) ("the deprivation of First Amendment rights entitles a plaintiff judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred"); *Williams v. Ollis,* 230 F.3d 1361, 2000 WL 1434459 (6th Cir. 2000)(PLRA does not cover First Amendment retaliation claim); *Rowe v. Shake,* 196 F.3d 778, 781 (7th Cir.1999)(no requirement of physical, mental or emotional injury for First Amendment claim because deprivation of First Amendment rights standing alone is a cognizable injury); *Amaker v. Haponik,* 1999 U.S. Dist. LEXIS 1568, 1999 WL 76798, *7(S.D.N.Y.)(§ 1997e(e) did not bar plaintiff's First Amendment claims); *Mason v. Schriro,* 45 F.Supp.2d 709, 720 (W.D.Mo. 1999)(§ 1997e(e) does not apply to Equal Protection claims under the Fourteenth Amendment); *Lewis v. Sheahan,* 35 F.Supp.2d 633, 637 n. 3 (N.D.Ill.1999) (§ 1997e(e) does not

bar a right of access claim); *Friedland v. Fauver,* 6 F.Supp.2d 292(D.N.J.1998) (§ 1997e(e) did not bar claim for unconstitutional incarceration following arrest without probable cause); *Warburton v. Underwood,* 2 F.Supp.2d 306, 315 (W.D.N.Y.1998)(declining to dismiss Establishment Clause claim under § 1997e(e) for want of plaintiff's showing of physical injury because "such claims nevertheless deserve to be heard")(cited in *Shaheed–Muhammad v. Dipaolo,* 138 F.Supp.2d 99, 109–10).

**3.** *See Monahan v. United States,* 276 F.Supp.2d 196, 204 n. 6 (D.Mass.2003).

**4.** When questioned by Magistrate Judge Delgado regarding Officer Smith's standard operating procedure for death eligible inmates, Warden Chávez concurred and corroborated that the death penalty certification, on its own, triggers placing an inmate in SHU.

legitimate governmental objective." *Id.* at 539, 99 S.Ct. 1861.

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."Conversely, **if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees** *qua* **detainees.**

*Id.* (emphasis added).

The Government contends that placement in administrative detention is reasonably related to the governmental objective of preserving the safety and orderly running of the institution. Inmates facing the death penalty, even though they are yet to be convicted and are presumed innocent, are automatically placed in SHU. This so called standard operating procedure has no connection whatsoever to the possible threat to the security and orderly running of the institution as no other factors are taken into consideration. The Government has proffered no evidence and has simply relied on the assumption that inmates facing the death penalty are inherently more prone to disrupt the orderly running of the institution if they remain in the general population since they are more likely to take a hostage, hurt a staff member, another inmate, or themselves. This presumption ignores the fact that Defendant resided in the general population for over ten (10) months without causing such disruption or taking any hostages, nor has such incident ever taken place at MDC according to Officer Smith's testimony.

Thus, we find that Defendant's placement in SHU is "excessive in relation to the alternate purpose assigned to it." *Id.* at 538. While we do give deference to correction officials, we cannot turn a blind eye. Institutional policies must be reasoned. Because Defendant's placement in SHU is not tied to any legitimate governmental interest, we conclude that it constitutes punishment. We are not treading new ground here. In *United States v. Gotti,* 755 F.Supp. 1159 (E.D.N.Y.1991), the Court found that the fact that pretrial detainees were charged with multiple murders, conspiracy and solicitation to murder, as well as obstruction of justice, including witness tampering, did not justify their placement in administrative detention, absent any evidence indicating that, since they had been in custody, they committed an act or omission which posed a serious threat to inmates or to the security of the institution. *See also, United States v. Suleiman,* No. 96CR933WK, 1997 WL 220308 (S.D.N.Y. April 11, 1997)(finding no justification for placing World Trade Center bombing defendant in administrative detention on the basis of alleged perjury during grand jury proceedings and association with individual convicted for role in the World Trade Center bombing).

### Constitutional Concerns

Defendant has raised several arguments that hinge on the Constitution. First, he alleges that his right to counsel is being encumbered due to the long visit delays in SHU. In response, the Government has proffered that, with prior notice, they can expedite the process. While this may presumably resolve this problem, we are more concerned with the effect that continued administrative segregation has on Defendant's psyche and hence, his ability to aid in his defense.

Defendant has been housed in SHU since December of 2003. "Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may dete-

riorate mentally and in some cases develop psychiatric disturbances." *Madrid v. Gomez,* 889 F.Supp. 1146, 1230 (N.D.Cal. 1995). This impact has been recognized by many courts. *See, e.g., Davenport v. DeRobertis,* 844 F.2d 1310, 1316 (7th Cir.1988)(noting that "there is plenty of medical and psychological literature concerning the 'ill effects' of solitary confinement (of which segregation is a variant)"); *McClary v. Kelly,* 4 Fed. Supp.2d 195 (W.D.N.Y.1998)("A conclusion . . . that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science."); *Kelly v. Brewer,* 378 F.Supp. 447, 451 (S.D.Iowa 1974)(relying on opinion testimony of psychologist who found that administrative segregation "and sensory deprivation resulting from such confinement can have extremely harmful psychological and physical effects upon the person involved"); *Landman v. Royster,* 354 F.Supp. 1302, 1307 (E.D.Va.1973) (relying on testimony of psychiatrist who found that "solitary confinement beyond a two or three week period would have a definite adverse effect upon most people").

■ This in turn ties into Defendant's ability to develop mitigating evidence for the penalty phase in the event that he is found guilty of the death eligible charges. We agree with the Government in that Defendant does not have a constitutional right to create good prison behavior in an environment of his choosing. However, the Supreme Court has made quite clear that the death sentence may not be imposed arbitrarily. *Jones v. United States,* 527 U.S. 373, 381, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Placement in SHU limits the amount and kind of mitigating evidence that a capital defendant might bring in the penalty phase. In *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Supreme Court held that "a defendant's disposition to make a well-behaved and peaceful adjustment to prison life is by itself an aspect of his character that is by nature relevant to the sentencing determination." *Id.* at 7, 106 S.Ct. 1669. From this inability to present mitigating evidence, a fact-finder might conclude that his continued placement in SHU implies "future dangerousness," in turn denying Defendant his due process right to contest that showing.

In *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court held that a defendant may not be sentenced to death "on the basis of information which he had no opportunity to explain or deny." It is constitutional error to place a "thumb . . . [on] the death's side of the scale." *Stringer v. Black,* 503 U.S. 222, 235, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). By enacting a capricious unwritten policy, the Government is crafting an "atmosphere of death" in capital cases by imposing unreasonable and unwarranted conditions of confinement, while simultaneously restricting Defendants ability to "explain or deny."

We note that as a pretrial detainee and as a capital defendant, Defendant enjoys greater protections. "The 'unique' nature of modern capital sentencing proceedings . . . derives from the fundamental principle that 'death is different' and the heightened reliability is required at all stages of the capital trial." *Schiro v. Farley,* 510 U.S. 222, 238, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (internal citations omitted). *See e.g., Fischer v. Winter,* 564 F.Supp. 281, 298 (N.D.Cal.1983)("Since sentenced inmates may be held under conditions that are punitive, while pretrial inmates may not be, the courts have said that the due process clause affords greater protection to unsentenced inmates than the Eight Amendment affords to the convicted."); *Reece v. Gragg,* 650 F.Supp. 1297, 1300 (D.Kan.1986)("Sentenced inmates may be held under conditions that are punitive,

while pretrial detainees may not be because they are still cloaked with presumption of innocence."); *Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia,* 877 F.Supp. 634, 664 n. 38 (D.D.C.1994)("Whereas convicted [prisoners] bring cause of action under the Eight Amendment, pretrial detainee[s][ ] rely upon the Fifth Amendment guarantee of due process. Though the unconstitutional conditions may be the same, 'the threshold for establishing a constitutional violation is clearly lower for pretrial detainees.'"). Therefore, we find that, based on the pleadings before us, Defendant's placement in SHU is excessive, arbitrary, and punitive. As such, his continued placement in SHU is unconstitutional.

## Conclusion

The Bureau of Prisons is perverting the principle reiterated by the courts that death is different. Several of the inmates housed in MDC are facing possible life sentences. Nonetheless, the B.O.P. has singled out death eligible inmates for punishment. Although the conditions in SHU are not *per se* unconstitutional, placing death eligible inmates in SHU solely based on said certification is not tied to any legitimate governmental interest.[5] It becomes a punitive measure rather than a valid security objective. Therefore, we hold that Defendant, a pretrial detainee, cannot be held in SHU on the sole basis that he is death eligible. Therefore, we hereby **ORDER** that he be reassigned to the general population.

**SO ORDERED.**

---

**5.** The Warden is not precluded from placing inmates in SHU for such legitimate purpose as he may deem appropriate, in the future. The imposition of conditions or restrictions, if any, should be in accordance with the provisions of 28 C.F.R. § 541.22, and should reflect the purpose assigned to the restriction for which placement in SHU may be rationally be connected.